# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

ROBERT DOBKIN,

      *Plaintiff*,

    v.

JOHN CRANE INC., U.S. SEAL MFG., and
SHELBY SCOTT, in his personal and professional
capacities,

      *Defendants*.

C. A. No. 2:14-cv-00973-JMA-AYS

**JURY TRIAL DEMANDED**

**ELECTRONICALLY FILED**

# DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

MORGAN, LEWIS & BOCKIUS LLP

Sarah E. Bouchard (admitted *pro hac vice*)
Jocelyn L. Womack (admitted *pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market St.
Philadelphia, Pennsylvania 19103
(215) 963-5000
(215) 963-5001 (fax)
sbouchard@morganlewis.com
jwomack@morganlewis.com

Melissa D. Hill
101 Park Ave.
New York, New York 10178
(212) 309-6000
(212) 309-6001 (fax)
melissa.hill@morganlewis.com

Counsel for Defendants

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................................... 1

II.     SUMMARY OF MATERIAL FACTS ........................................................................... 1

      A.      Plaintiff Primarily Worked In An Administrative Capacity In Which He
            Exercised Discretion And Independent Judgment Regarding Matters Of
            Significance ................................................................................................... 2

      B.      Mr. Scott Becomes General Manager Of U.S. Seal ............................................... 4

      C.      John Crane Begins The Strengthening Global Effectiveness Initiative ................ 5

      D.      Implementing The New Organizational Structure At U.S. Seal ........................... 7

III.    LEGAL ARGUMENT .................................................................................................... 8

      A.      The Summary Judgment Standard ......................................................................... 8

      B.      Defendants Are Entitled To Summary Judgment On Plaintiff's Age
            Discrimination Claims. ......................................................................... 10

            1.      Mr. Scott Is Not Individually Liable ...................................................... 15

      C.      Plaintiff's Retaliation Claims Fail As A Matter of Law ..................................... 16

      D.      Plaintiff Was Properly Classified As An Exempt Employee .............................. 17

      E.      Plaintiff's New Jersey State Law Claims Should Be Dismissed ........................ 23

IV.     CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Abdu-Brisson v. Delta Airlines, Inc.*,
 239 F.3d 456 (2d Cir. 2001)................................................................................10

*Asante-Addawe v. Sodexo, Inc.*,
 No. 13-004889, 2015 WL 1471927 (D. Conn. Mar. 31, 2015) .............................10

*Ayala-Gerena v. Bristol Myers-Squibb Co.*,
 95 F.3d 86 (1st Cir. 1996)....................................................................................14

*Bucalo v. Shelter Island Union Free Sch. Dist.*,
 691 F.3d 119 (2d Cir. 2012)..................................................................................17

*Cameron v. Abercrombie & Fitch Co.*,
 No. 10-631, 2012 WL 4057240 (S.D. Ohio Sept. 14, 2012) .................................19

*Caveness v. Vogely & Todd*,
 No. 10-0650, 2011 WL 3841649 (M.D. Tenn. Aug. 30, 2011).............................20

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986)................................................................................................8

*Del Franco v. N.Y. City Off-Track Betting Corp.*,
 429 F. Supp. 2d 529 (E.D.N.Y. 2006) ...................................................................9

*Delaney v. Bank of Am. Corp.*,
 766 F.3d 163 (2d Cir. 2014)...............................................................11, 12, 13, 15

*Deville v. Givaudan Fragrances Corp.*,
 419 F. App'x 201 (3d Cir. 2011)............................................................................17

*Estrada v. Maguire Ins. Agency, Inc.*,
 No. 12-604, 2014 WL 795996 (E.D. Pa. Feb. 28, 2014) ......................................21

*Exarhakis v. Visiting Nurse Serv. of N.Y.*,
 No. 02 Civ. 5562, 2006 WL 335420 (E.D.N.Y. Feb. 13, 2006)............................9

*Fontecchio v. ABC Corp.*,
 No. 12-6998, 2015 WL 327838 (S.D.N.Y. Jan. 23, 2015) ................................13, 14

*Goodman v. Port Auth. of N.Y. & N.J.*,
 850 F. Supp. 2d 363 (S.D.N.Y. 2012)...................................................................24

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Graves v. Chubb & Son, Inc.*,
  No. 12-568, 2014 WL 1289464 (D. Conn. Mar. 31, 2014) ....................................................19

*Gross v. FBL Financial Services, Inc.*,
  557 U.S. 167 (2009)..........................................................................................................9, 10, 11

*Harth v. Daler-Rowney USA Ltd.*,
  No. 09-5332, 2012 WL 893095 (D.N.J. Mar. 15, 2012) .........................................................9

*Herman v. Coastal Corp.*,
  348 N.J. Super. 1 (App. Div.), *certif. denied*, 174 N.J. 363 (2002).........................................16

*Kulak v. City of New York*,
  88 F.3d 63 (2d Cir. 1996)..........................................................................................................9

*LaCourse v. GRS III*,
  No. 05-73613, 2006 WL 3694623 (E.D. Mich. Dec. 13, 2006) .............................................20

*Lutz v. Huntington Bancshares Inc.*,
  No. 12-1091, 2014 U.S. Dist. LEXIS 86435 (S.D. Ohio June 25, 2014) ...............................21

*Mattera v. JP Morgan Chase Corp.*,
  740 F. Supp. 2d 561 (S.D.N.Y. 2010)...................................................................................9, 11

*Mullins v. City of New York*,
  653 F.3d 104 (2d Cir. 2011).....................................................................................................18

*Norenius v. Multaler, Inc.*,
  Dkt. L-449-06, 2009 WL 4162878 (N.J. App. Div. Sept. 11, 2008) .......................................24

*Overton v Sanofi-Aventis U.S., LLC*,
  No. 13-5535, 2014 WL 5410653 (D.N.J. Oct. 23, 2014 ) ..................................................24, 25

*Penney v. AIG*,
  No. 04-9071, 2007 WL 541711 (S.D.N.Y. Feb. 20, 2007)......................................................10

*Raffe v. Am. Nat'l Red Cross*,
  No. 08-211, 2011 WL 6019436 (N.D.N.Y Nov. 30, 2011) ................................................18, 22

*Redick v. E. Mortg. Mgmt., LLC*,
  No. 11-1260, 2013 WL 1089710 (D. Del. Mar. 15, 2013) ......................................................24

*Reich v. Schering-Plough Corp.*,
  399 F. App'x 762 (3d Cir. 2010) .............................................................................................10

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Robinson v. Zurich N.A. Ins. Co.*,
   892 F. Supp. 2d 409 (E.D.N.Y. 2012) ..............................................................8, 9

*Romero v. H.B. Auto. Group, Inc.*,
   No. 11-386, 2012 WL 1514810 (S.D.N.Y. May 1, 2012) ......................................18

*Seabrook v. NYC Health & Hospitals Corp.*,
   No. 13-4164, 2015 WL 273652 (S.D.N.Y. Jan. 20, 2015) ....................................17

*Shaw v. FedEx Corp.*,
   No. A-1634-10T3, 2012 WL 3116722 (App.Div. July 20, 2012) ..........................16

*Tarr v. Ciasulli*,
   181 N.J. 70 (2004) ................................................................................................16

*White v. Smiths Detection, Inc.*,
   No. 10-4078, 2011 WL 1466160 (D.N.J. Apr. 15, 2011) ......................................15

*Workneh v. Pall Corp.*,
   897 F. Supp. 2d 121 (E.D.N.Y. 2012) ..................................................................9

**STATUTES**

29 U.S.C. § 213(a)(1)....................................................................................................17

**OTHER AUTHORITIES**

29 C.F.R. § 541.200(a)(1)..............................................................................................18

29 C.F.R. § 541.201(a)...................................................................................................19

29 C.F.R. § 541.201(b) ..................................................................................................19

29 C.F.R. § 541.202(a)...............................................................................................21, 22

29 C.F.R. § 541.700(a)...................................................................................................18

Fed. R. Civ. P. 56(c) .......................................................................................................8

Fed. R. Civ. P. 56(e) .......................................................................................................8

## I.    INTRODUCTION

Plaintiff Robert Dobkin alleges that John Crane Inc. ("John Crane"), U.S. Seal Manufacturing ("U.S. Seal") and Shelby Scott (collectively, "Defendants"), discriminated against him on the basis of his age.  He also alleges that he was retaliated against because of comments he made at the time he was advised of the elimination of his position.  Plaintiff's discrimination claim rests solely on his contention his position was eliminated at U.S. Seal during a Company-wide reorganization in which 100 positions were eliminated across the world.  His retaliation claim rests on the dubious contention that the Company did not pay him to work for a two-week period that he concedes he refused to work.  Plaintiff also contends that, despite working remotely at his home in New York with minimal supervision for at least the last 13 years of his employment at U.S. Seal, he was misclassified as an exempt employee.  Finally, although Plaintiff spent the last 13 years of his employment at U.S. Seal living and primarily working in New York, Plaintiff seeks to pursue remedies under the state laws of both New York and New Jersey.  His attempts to "shop" his state law claims notwithstanding, his occasional visits to U.S. Seal's New Jersey location do not warrant application of the laws and statutes of that state to his claims.

For the reasons set forth below, Plaintiffs claims are without merit and judgment as a matter of law should be entered in favor of Defendants on all Counts of the Amended Complaint.

## II.    SUMMARY OF MATERIAL FACTS[1]

Plaintiff began working at U.S. Seal in January 1962.  (Def. 56.1 ¶ 1).  In March 2005, U.S. Seal became a subsidiary of John Crane.  (Def. 56.1 ¶ 4).  At that time, Plaintiff began reporting to Gary Stockslager, whom the Company hired that year as General Manager of U.S.

---

[1]    A more detailed recitation of the facts is contained in Defendants' Local Rule 56.1 Statement of Undisputed Facts ("Def. 56.1") submitted herewith.

Seal.  (Def. 56.1 ¶ 5).  When Mr. Stockslager joined U.S. Seal, Plaintiff had already been

working from his Woodmere, New York home five days a week for roughly five years because

of the long commute of approximately 60 miles each way.  (Def. 56.1 ¶ 5-6).  Mr. Stockslager

allowed Plaintiff to continue the remote working arrangement, provided that Plaintiff agreed to

occasionally come into U.S. Seal's Edison, New Jersey location when Mr. Stockslager needed

additional coverage.  (Def. 56.1 ¶ 8).  His visits to the office amounted to approximately 15-20

times per year.  (Def. 56.1 ¶ 9).

Although Plaintiff was often dissatisfied with his pay, the Company made several efforts

to ensure that he received salary increases commensurate with his experience.  (Def. 56.1 ¶ 31).

This included appointing Plaintiff to the Operations Manager title in order to justify a higher

salary.  (Def. 56.1 ¶ 32).  When Mr. Stockslager needed someone on-site to fully take on the

Operations Manager role, he worked with Human Resources ("HR") to transfer Plaintiff to the

Senior Product Manager position and ensured that Plaintiff remained at the same salary.  (Def.

56.1 ¶ 33).

### A. Plaintiff Primarily Worked In An Administrative Capacity In Which He Exercised Discretion And Independent Judgment Regarding Matters Of Significance.

As Senior Product Manager, Plaintiff's primary job responsibilities included:  (1)

managing inventory; (2) issuing work orders; (3) expediting deliveries; (4) generating quotes for

deliveries to the sales department and customers; (5) issuing purchase orders to outside vendors;

and (6) expediting purchase orders to outside vendors when necessary.  (Def. 56.1 ¶ 10).

According to Plaintiff, Mr. Stockslager had confidence in his abilities and despite his remote

working arrangement, Plaintiff was not required to report on his activities more than once a

month.  (Def. 56.1 ¶ 11).  The reporting requirements remained the same until the end of

Plaintiff's employment.  (Def. 56.1 ¶ 12).

2

Comments on his performance reviews reflect that he was provided significant discretion in carrying out his duties.  Mr. Stockslager observed that Plaintiff's "decisions [were] on target and reflect[ed] his reliable, sound judgment skills.  (Def. 56.1 ¶ 13).  Plaintiff was acknowledged for his "clear understanding of the business implications of each decision he ma[d]e."  (Def. 56.1 ¶ 14).  Mr. Stockslager also recognized Plaintiff's ability to "confront[] difficult situations quickly [and] consistently appl[y] a win-win approach to negotiating outcomes."  (Def. 56.1 ¶ 15).

Plaintiff's duties were varied, but reflective of duties directly related to the management and general operations of U.S. Seal.  (Def. 56.1 ¶¶ 10, 13-30 ).  While managing inventory for U.S. Seal, Plaintiff set safety stock levels, which entailed monitoring the level of inventory on an item the site was authorized to carry.  (Def. 56.1 ¶ 16).  Although there was guidance on inventories available, Plaintiff ultimately leveraged his experience to determine where U.S. Seal was "going with a particular item, [to determine] if it was new [based on] input from the sales department."  (Def. 56.1 ¶ 17).  When issuing work orders, Plaintiff reviewed reports to "determine whether to go ahead and make [an] item, whether [U.S. Seal] could assemble the item completely [and] issue the work order."  (Def. 56.1 ¶ 18).  If the inventory level went below a certain amount, Plaintiff evaluated a cross-section of data in order to determine if a new product needed to be made.  (Def. 56.1 ¶ 19).

Plaintiff also directed the assembly department to expedite orders when he determined that a customer's order was more urgent than inventory needs.  (Def. 56.1 ¶ 21).  According to Plaintiff, he leveraged his "historical intermixing with the inventory" "knowledge of where components were used elsewhere" to ensure that he did not "commit all components [] to one particular work order" to prevent U.S. Seal from being out of stock of items and unable to make

other "finished goods." (Def. 56.1 ¶ 22). When expediting deliveries, Plaintiff relied on his "ability to interface with various people in the organization" and his "knowledge of the organization" to assess various sources of materials. (Def. 56.1 ¶ 24). He also had the discretion to change where an item was sourced in order to help expedite orders. (Def. 56.1 ¶ 25).

Although Plaintiff did not have any direct reports, he advised both U.S. Seal employees and external customers when quoting deliveries. (Def. 56.1 ¶ 26). When quoting deliveries, Plaintiff checked availability of missing components, estimated the length of time necessary to get various components so that he could advise the sales department or the external customer about expected delivery dates. (Def. 56.1 ¶ 27). When issuing and expediting purchase orders, Plaintiff reviewed the "historical movements" of an item, determined how much of an item to order and then verified the current cost of the item. (Def. 56.1 ¶ 28). Because data on the U.S. Seal system was at times outdated, Plaintiff leveraged his relationships with vendors in order to get current cost data. (Def. 56.1 ¶ 29).

### B.   Mr. Scott Becomes General Manager Of U.S. Seal.

After Mr. Stockslager's retirement in December 2012, Shelby Scott became the General Manager of U.S. Seal. (Def. 56.1 ¶ 35). Mr. Scott joined U.S. Seal in February 2013. (Def. 56.1 ¶ 36). When he first started, Mr. Scott endeavored to learn more about his employees and their roles at U.S. Seal. (Def. 56.1 ¶ 37). As part of his initial analysis, Mr. Scott looked at the use of U.S. Seal's manufacturing representatives and direct sales employees to evaluate their effectiveness. (Def. 56.1 ¶ 39). Mr. Scott shared ideas about making the site more efficient by reducing duplicative efforts across certain positions, including Plaintiff's. (Def. 56.1 ¶ 45). He had concerns about the efficiencies of Plaintiff's remote working arrangement, which he raised with his supervisor at the time, John Donatiello. (Def. 56.1 ¶ 41). Mr. Donatiello is currently Vice President, Global End Users at John Crane. (Def. 56.1 ¶ 42).

4

There were also ongoing discussions of forecasting in the course of business at U.S. Seal and at John Crane, which included ensuring that U.S. Seal employees were cross-trained other positions so that there would always be sufficient coverage for a position if a person was out on vacation or some other type of leave.  (Def. 56.1 ¶¶ 46-47).  Mr. Scott consulted with Priscilla Fernandez about forecasting and cross-training because she was the Operations Manager at U.S. Seal.  (Def. 56.1 ¶¶ 48-51).  As Operations Manager, Ms. Fernandez was heavily involved in cross-training initiatives at U.S. Seal.  (Def. 56.1 ¶ 48).

In her role as Operations Manager, Ms. Fernandez had concerns that Plaintiff could leave at any time, and on short notice, and take his decades of expertise with him.  (Def. 56.1 ¶ 60-64). Ms. Fernandez also recognized that Plaintiff was a key part of U.S. Seal's branding because of his relationships with customers who had been purchasing from the Company for 50 years.  (Def. 56.1 ¶ 59).  On a few occasions, Plaintiff would get frustrated and say "I'm sick of this place" or "I'm going to quit," particularly after receiving his merit increase for the year.  (Def. 56.1 ¶ 64). Although Ms. Fernandez suspected Plaintiff made the remarks out of frustration, she had not had any conversations with him about his plans for the future, or any retirement plans, so she wanted to be sure that U.S. Seal was prepared from an operations standpoint.  (Def. 56.1 ¶¶ 65-66). Although technically any employee could leave at any given time, her concerns regarding Plaintiff were heightened because she was not cross-training anyone else at U.S. Seal on **all** aspects of his position.  (Def. 56.1 ¶ 67) (emphasis added).  She had similar concerns about another employee in the assembly department who was the only one at U.S. Seal who knew how to handle cycle counting.  (Def. 56.1 ¶ 68).  As Ms. Fernandez observed, "If one person specialized in something, I wanted someone else to be able to take on that [i.e., responsibilities] as well."  (Def. 56.1 ¶ 73).

### C.     John Crane Begins The Strengthening Global Effectiveness Initiative.

In May 2013, John Crane announced the Strengthening Global Effectiveness ("SGE") initiative.  (Def. 56.1 ¶ 74).  The goals of SGE included:  (1) taking the complexity out of the business; (2) leveraging the resources of John Crane's super-centers at smaller locations, such as U.S. Seal; and (3) broadening the span of control so that decision making would become much quicker, thus allowing the Company to better align worldwide.  (Def. 56.1 ¶¶ 75-76).  All of the roughly 7,000 positions throughout John Crane were evaluated during SGE in determining what the best organizational structure would be for the company.  (Def. 56.1 ¶¶ 77, 82).

With the assistance of a consulting group and input from mid-level managers, John Crane's leadership developed a new organizational structure, which resulted in the elimination of Plaintiff's Senior Product Manager position, among many others.  (Def. 56.1 ¶ 81).  As part of the reorganization, Terry Lemm became Director of Sales and Services for U.S. East at John Crane.  (Def. 56.1 ¶¶ 87-88).  In this role, Mr. Lemm reported directly to Mr. Donatiello and became Mr. Scott's direct supervisor.  (Def. 56.1 ¶ 89).  Mr. Donatiello provided Mr. Lemm with SGE's guidelines and asked him to put together a proposal for John Crane's U.S. East organizational structure, which included U.S. Seal.  (Def. 56.1 ¶ 91).  Mr. Lemm was charged with developing an organizational structure made up of no more than six layers, i.e., reporting lines.  (Def. 56.1 ¶¶ 90-92).  In addition to developing a flatter organizational structure, Mr. Lemm also understood that the SGE initiative might result in position eliminations in order to create resources to invest in other aspects of the Company.  (Def. 56.1 ¶¶ 78-80; 94).  In particular, the Company was looking to invest in its marketing divisions.  (Def. 56.1 ¶ 95).

Mr. Lemm worked with Mr. Scott to determine which positions were essential for the business at U.S. Seal.  (Def. 56.1 ¶¶ 93, 96).  In assessing Plaintiff's Senior Product Manager position, two options were explored:  (1) eliminating the position and absorbing the role within

the organization and (2) retaining the position with the caveat that it could no longer be done remotely.  (Def. 56.1 ¶¶ 98-99).  If the position was retained, Plaintiff would have been considered for the role, but there were concerns that he would be unwilling to forego his 15-year remote working arrangement.  (Def. 56.1 ¶ 100).  It was ultimately determined that the position would be eliminated and that the duties would be absorbed by employees at U.S. Seal and at John Crane's Swedesboro super-center.  (Def. 56.1 ¶ 101).  Mr. Donatiello approved the elimination of the position, based on from the recommendation for the organizational structure proposed by Mr. Lemm.  (Def. 56.1 ¶¶ 106-107).  Notably, there were no discussions about Plaintiff's age, years of service with the Company or eligibility for retirement during the discussions about the position.  (Def. 56.1 ¶ 97).  Although Ms. Fernandez was the Operations Manager at U.S. Seal, she had absolutely no involvement in SGE discussions and had no idea that the Senior Product Manager role was eliminated until October 17, 2013, the same day the decision was communicated to Plaintiff.  (Def. 56.1 ¶¶ 109-113).

### D. Implementing The New Organizational Structure At U.S. Seal.

On October 17, 2013, Mr. Scott and Human Resources Manager Tara Kandra met with Plaintiff to advise him that his employment was being terminated due to the elimination of the Senior Product Manager position.  (Def. 56.1 ¶ 114).  During the meeting, Mr. Scott presented Plaintiff with a severance agreement and release based on John Crane's standard severance package.  (Def. 56.1 ¶ 115-116).  Mr. Scott advised Plaintiff of an offer to pay him two weeks beyond his termination date, if he agreed to make himself available for questions via phone.  (Def. 56.1 ¶ 117).  Plaintiff declined the request and the severance offer and as such, was paid through his final day of work.  (Def. 56.1 ¶ 118).

Plaintiff's position was never reinstated.  (Def. 56.1 ¶ 125).  After Plaintiff's departure, William Bulthuis (age 65) and Ms. Fernandez (age 45) took on of Plaintiff's primary job

responsibilities.  (Def. 56.1 ¶ 126).  Mr. Bulthuis manages inventory by reviewing "work orders

to be placed and sent to the [assembly department] to be made."  (Def. 56.1 ¶ 128).  The length

of his work day did not increase after taking on the additional duties, as he was able to work

more efficiently.  (Def. 56.1 ¶ 129).  Ms. Fernandez handles Plaintiff's former responsibility for

configuring orders and aspects of his purchasing duties.  (Def. 56.1 ¶ 130).  Ms. Fernandez also

took on Plaintiff's responsibility for looking up releases, checking on components to be sure that

they are in transit, working with John Crane's San Fernando location on transferring parts and

reviewing work orders.  (Def. 56.1 ¶ 131).  Mr. Bulthuis and Ms. Fernandez are both exempt

employees.  (Def. 56.1 ¶ 127).  The remaining, non-primary duties were split between Rachel

Palumbo (age 37) and a customer service representative.  (Def. 56.1 ¶ 132).

Mr. Scott initially had reservations about the ability to absorb all of Plaintiff's job duties,

which led him to approach Mr. Lemm about bringing Plaintiff back on in a consulting role.

(Def. 56.1 ¶ 133).  After a brief transition period, the business now runs more smoothly at U.S.

Seal because there are "not so many hands touching or calling" various aspects of the business

and the time spent calling from person to person to get things done has decreased.  (Def. 56.1 ¶

134).

According to Plaintiff, the **termination of his employment** is the **sole basis** of his

discrimination claims.  (Def. 56.1 ¶ 119) (emphasis added).  During the course of his fifty-one

years of employment at U.S. Seal, he admits that he suffered no discrimination or harassment

due to his age.  (Def. 56.1 ¶ 119).  Likewise, Plaintiff never complained to anyone about being

owed overtime compensation.  (Def. 56.1 ¶ 124).

## III.   LEGAL ARGUMENT

### A.   The Summary Judgment Standard.

Fed. R. Civ. P. 56(c) provides that summary judgment "shall be rendered forthwith" if the

8

movant shows "that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 n.4

(1986). In order to prove that a genuine issue of material fact exists, a plaintiff "may not rest

upon the mere allegations or denials of the . . . pleadings," but must by admissible evidence "set

forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);

*Robinson v. Zurich N.A. Ins. Co.*, 892 F. Supp. 2d 409, 413 (E.D.N.Y. 2012) (same). Mere

conclusory statements, conjecture, or speculation cannot by themselves create a genuine issue of

material fact sufficient to avoid summary judgment. *See Kulak v. City of New York*, 88 F.3d 63,

71 (2d Cir. 1996); *Robinson*, 892 F. Supp. 2d at 413; *Del Franco v. N.Y. City Off-Track Betting*

*Corp.*, 429 F. Supp. 2d 529, 534 (E.D.N.Y. 2006). This applies no less to discrimination cases

than to commercial or other areas of litigation. *Exarhakis v. Visiting Nurse Serv. of N.Y.*, No. 02

Civ. 5562, 2006 WL 335420, at *5 (E.D.N.Y. Feb. 13, 2006) (granting summary judgment for

the employer on discrimination claims). As one court observed, "even in the discrimination

context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a

motion for summary judgment." *Workneh v. Pall Corp.*, 897 F. Supp. 2d 121, 129 (E.D.N.Y.

2012) (internal citations and quotation marks omitted).

Moreover, since the Supreme Court's decision in *Gross v. FBL Financial Services, Inc.*,

557 U.S. 167, 173 (2009), a plaintiff bringing a disparate treatment claim pursuant to the ADEA

must satisfy a higher evidentiary burden by "prov[ing] by a preponderance of the evidence

(which may be direct or circumstantial), that age was the 'but-for' cause of the challenged

employer decision." *Mattera v. JP Morgan Chase Corp.*, 740 F. Supp. 2d 561, 571 n. 8

(S.D.N.Y. 2010) (quoting *Gross*) ("*Gross* **increases** plaintiff's burden at the third stage of the

*McDonnell Douglas* analysis to 'raise[] sufficient evidence upon which a reasonable jury could

conclude by a preponderance of the evidence that her age was a 'but for' cause of [defendant's] decision to fire her.") (emphasis added).[2]

Because Plaintiff has failed to adduce any evidence to support his claims, there are no genuine issues of material fact and, thus, Defendants' summary judgment motion should be granted.

### B. Defendants Are Entitled To Summary Judgment On Plaintiff's Age Discrimination Claims.

In Counts IV, VI and IX of his Amended Complaint, Plaintiff asserts age discrimination claims – all of which are subject to the familiar *McDonnell Douglas* burden-shifting analysis. *Abdu-Brisson v. Delta Airlines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001); *Penney v. AIG*, No. 04-9071, 2007 WL 541711, at n. 13 (S.D.N.Y. Feb. 20, 2007). Defendants are entitled to summary judgment on these claims because there are no circumstances supporting an inference of age discrimination against Plaintiff, nor can he show that the legitimate, nondiscriminatory reasons for the elimination of his position were pretextual.

Plaintiff's position was eliminated as part of a Company-wide reorganization where numerous other employees also lost their job. (Def. 56.1 ¶¶ 74-80, 84-86, 101-102). By his own

---

[2]     *Mattera* also applies the *Gross* standard to claims under the NYSHRL, noting that "[a]ge discrimination claims brought under the NYHRL are evaluated under the **same standards** that govern the ADEA." 740 F. Supp. 2d at 571 n.7 (emphasis added).

In cases where the plaintiff has chosen to only pursue claims under the NJLAD, courts have held that *Gross* does not apply "insofar as [p]laintiff asserts a cause of action under the NJLAD *only* and asserts no federal cause of action under the ADEA . . . ." *Harth v. Daler-Rowney USA Ltd.*, No. 09-5332, 2012 WL 893095, at *6 (D.N.J. Mar. 15, 2012) (emphasis added). However, in cases where the claimant has pursued claims under both the NJLAD and the ADEA, such as Plaintiff's, courts have applied the *Gross* standard to both the federal and state law claims. *See generally Reich v. Schering-Plough Corp.*, 399 F. App'x 762, 765 (3d Cir. 2010) (citing *Gross* with respect to claims under the ADEA and NJLAD and observing that "[t]he burden of persuasion, however, remains on the claimant to prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action."); *Bleistine v. Diocese of Trenton*, 914 F. Supp. 2d 628, 644 (D.N.J. 2012) (applying the *Gross* standard to the plaintiff's ADEA claims in finding that the evidentiary burden was not met and ruling that "[b]ecause [p]laintiff's ADEA claim will not survive summary judgment, [p]laintiff's NJLAD claim will also be dismissed" because "the [c]ourt's ADEA discussion [] applies equally to [p]laintiff's NJLAD claims").

admission, Plaintiff knew nothing about the SGE reorganization under which his position was eliminated and his disagreement with the decision is not a substitute for evidence of discriminatory intent.  (Def. 56.1 ¶ 120); *see also Asante-Addawe v. Sodexo, Inc.*, No. 13-004889, 2015 WL 1471927, at *11 (D. Conn. Mar. 31, 2015) ("[A] plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn.") (citations omitted).  Since the termination of Plaintiff's employment, the headcount at U.S. Seal has continued to decrease.  (Def. 56.1 ¶¶ 141-143).  At least two other positions at U.S. Seal have been eliminated and like Plaintiff's position, those job titles have not been reinstated.  (Def. 56.1 ¶ 141).

A reduction in force or reorganization "constitutes a legitimate, nondiscriminatory reason for termination of employment."  *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 168 (2d Cir. 2014) (citing *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001).  Thus, the pertinent issue is "whether 'the evidence, viewed in the light most favorable to the plaintiff, would permit a jury to find . . . . that age was the but-for cause of the challenged adverse employment action.'"  *Delaney*, 766 F.3d at 168 (citations omitted); *see also Mattera*, 740 F. Supp. 2d at 571 ("*Gross* **increases** plaintiff's burden at the third stage of the McDonnell Douglas analysis to raise[] sufficient evidence upon which a reasonable jury could conclude… that her age was a 'but for' cause of [defendant's] decision to fire her") (emphasis added).

Here, Plaintiff must demonstrate that the elimination of his position and termination of his employment would not have occurred without consideration of his age.  As the Second Circuit observed in *Delaney*, "[t]he condition that a plaintiff's age must be the 'but for' cause of the adverse employment action is not equivalent to a requirement that age was the employer's

only consideration, but rather that the adverse employment action would not have occurred without it."  766 F.3d at 169.

Here, there is no evidence reflecting that the individuals involved in the decision to eliminate the Senior Product Manager position – Donatiello, Lemm and Scott – took Plaintiff's age, years of service or eligibility for retirement under consideration.  The elimination of Plaintiff's position, as with all of the positions eliminated as part of SGE, was a business decision made in support of the reorganization initiative.  Although courts are charged with ensuring that employers do not act in a discriminatory manner, they do "not sit as a super-personnel department that reexamines an entity's business decision."  *Delaney*, 766 F.3d at 169 (quoting *Scaria v. Rubin*, 117 F.3d 652, 655 (2d Cir. 1997).)

In *Delaney*, the Second Circuit held that the fact that an employee was the oldest member in his group and the only employee terminated during a reduction in force was not sufficient to sustain his age discrimination claim.  766 F.3d at 163-170.[3]  The plaintiff tried to offer into evidence an EEOC Charge filed by another employee alleging that the defendant discriminated against him in violation of the ADEA based on comments allegedly made regarding his age.  766 F.3d at 169.  The court ruled that such evidence was inadmissible and even it if it was admissible, the comments would not suffice to create a genuine issue of fact as to whether age was the "but for" cause of the plaintiff's termination without some context establishing a connection between the comments and the decision regarding the plaintiff's employment.  *Id.* at 170.  The court also rejected the plaintiff's arguments that the defendant engaged in a "campaign" against the oldest members of his group and took "simultaneous action against the

---

[3]   In *Delaney*, the employer selected the plaintiff for the reduction in force due to his performance.  766 F.3d at 163-170.  Defendants do not contend that Plaintiff's position was eliminated due to performance issues; however, the court's analysis still applies because it acknowledges the right of an employer to make decisions in the best interest of the business.  *Id.* at 169.

12

two oldest members" of his group" because he could not point to any admissible evidence in supporting such a "campaign," and that those allegations were not supported with actual facts. *Id.* at 170.

Because a reorganization is a legitimate, nondiscriminatory reason for termination, Plaintiff must produce evidence sufficient to support a finding that Defendants' stated reasons for the elimination of his position "are false or that discrimination was the true reason for [his] termination." *Fontecchio v. ABC Corp.*, No. 12-6998, 2015 WL 327838, at *8 (S.D.N.Y. Jan. 23, 2015); *see also Delaney*, 766 F.3d at 168.  Notably, Plaintiff testified that the sole basis of his discrimination claim is the termination of his employment.  (Def. 56.1 ¶ 119).  He admitted that there were no statements regarding his age made to him, nor were there any other decisions relating to his employment that he believed were a result of age discrimination.  (Def. 56.1 ¶ 119).

Plaintiff, however, will likely point to the e-mail from Ms. Fernandez to Mr. Scott in April 2013 as evidence of pretext.  In that message, Ms. Fernandez raised concerns about staffing issues that might arise if Plaintiff or another employee eligible for retirement suddenly departed from U.S. Seal.  (Def. 56.1 ¶¶ 50-73).  In the e-mail, Ms. Fernandez stated:

> "Robert Dobkin[,] who has 50 years of experience, has insured the continuity between our strategic goals, sales forecasting (safety stock), production planning and the product & material planning.  He has managed the flow of materials, effectively utilizing people and coordinating internal activities.  Unfortunately, his health and age is a major concern for our organization.
>
> To find someone to train and replace either one, when they decide to move on will be difficult.  Training someone now, would save us the major impact it would cause, **when they decide[] to leave us.**"

(Def. 56.1 ¶¶ 50-54 ) (emphasis added).

Ms. Fernandez's e-mail in no way advocated for pushing out Plaintiff because of his age.  (Def. 56.1 ¶¶ 56-68).  Rather, she wanted to be sure that U.S. Seal was undertaking appropriate cross-training measures.  (Def. 56.1 ¶¶ 56-73).  Ms. Fernandez understood the value that Plaintiff brought to U.S. Seal and believed that his sudden departure would hurt the business.  (Def. 56.1 ¶¶ 56-63 ).  On a few occasions, Ms. Fernandez witnessed Plaintiff getting frustrated and overheard him saying "I'm sick of this place" or "I'm going to quit."  (Def. 56.1 ¶ 64).  Although Ms. Fernandez suspected Plaintiff made the remarks out of frustration, she had not had any conversations with him about his plans for the future with the Company so she wanted to be sure that U.S. Seal was prepared from an operations standpoint.  (Def. 56.1 ¶ 65).  Plaintiff was the only person in his position and although technically any employee could leave at any given time, her concerns regarding Plaintiff were heightened because she was not cross-training anyone else at U.S. Seal on all aspects of his position.  (Def. 56.1 ¶ 67).  Cross-training was not limited to the Senior Product Manager position, as it was done for positions held by employees of all ages at U.S. Seal.  (Def. 56.1 ¶¶ 68-73).

Ms. Fernandez was not involved in SGE, nor did she have conversations with anyone at the Company about eliminating the Senior Product Manager position.  (Def. 56.1 ¶¶ 109-111).  In fact, Ms. Fernandez did not learn about the elimination of the position and termination of Plaintiff's employment until roughly 20 minutes before Mr. Scott shared the information with Plaintiff.  (Def. 56.1 ¶ 112).  She was upset and shocked by the news.  (Def. 56.1 ¶ 113).

Given Ms. Fernandez's complete lack of involvement in SGE, and that her remarks related to cross-training, the email lacks any proof of pretext and do nothing to preclude a summary judgment ruling in Defendants' favor.  *Fontecchio*, 2015 WL 327838, at *8 (ruling that statements such as the plaintiff was "older," "had been around forever," and "old school," made

by "non decision-makers, or statements by decision-makers unrelated to the decisional process itself" cannot "satisfy the plaintiff's burden" to establish inference of discrimination); *Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 97 (1st Cir. 1996) (plaintiffs failed to establish discriminatory animus in part because they could not show that employees who made offensive comments "were decision-makers who made the comments in connection with the decisional process").

John Crane does not make employment decisions motivated by age bias of any kind.  The Company promoted Mr. Scott to the General Manager of U.S. Seal at age 59 and assigned Mr. Bulthuis to take over key job duties from Plaintiff at age 65.  (Def. 56.1 ¶ 36, 128).  These are not decisions indicative of age bias.  Plaintiff cannot simply point to the fact that he was the oldest employee at U.S. Seal and that he suffered adverse action in order to sustain his claims – there must be much more evidence, which is unquestionably absent here.  *Delaney*, 766 F.3d at 170 ("[A] plaintiff must provide more than conclusory allegations to resist a motion for summary judgment").

### 1.  Mr. Scott Is Not Individually Liable.

Because the Company eliminated Plaintiff's position for legitimate, nondiscriminatory reasons, Mr. Scott cannot be held *individually* liable under the NJLAD and the NYSHRL.  According to Plaintiff, his age discrimination claims are based on a single act – the termination of his employment resulting from the reorganization.  (Def. 56.1 ¶ 119).  As such, if the Company is not liable for discrimination, it is axiomatic that Mr. Scott is not individually liable for discrimination.  *Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 436 (E.D.N.Y. 2012) ("[A]s the employee's liability necessarily hinges on that of the employer, the employer must be held liable for an individual to also be held liable under the [NYSHRL].");  *White v. Smiths Detection, Inc.*, No. 10-4078, 2011 WL 1466160, at *5 (D.N.J. Apr. 15, 2011)  ("Because the

15

Court finds no NJLAD violation for discriminatory demotion, constructive discharge, retaliation or hostile work environment, the individual defendants cannot be held liable for aiding and abetting on those grounds.").

Assuming *arguendo* that Plaintiff's age discrimination claims survive summary judgment, the aiding and abetting claims against Mr. Scott pursuant to the NJLAD should still be dismissed. If Plaintiff purports to allege that Mr. Scott discriminated against him due to his involvement in the decision to eliminate the Senior Product Manager position, Mr. Scott cannot also be held liable for aiding and abetting in his own alleged wrongdoing. *Shaw v. FedEx Corp.*, No. A-1634-10T3, 2012 WL 3116722, at *7 (App.Div. July 20, 2012) ("[A] person cannot be found to have aided and abetted discrimination if he or she was the perpetrator of discrimination."); *see also Herman v. Coastal Corp.*, 348 N.J. Super. 1, 27, (App. Div.), *certif. denied*, 174 N.J. 363 (2002) (same).

Further, no evidence exists that Mr. Scott possessed the state of mind to "knowingly and substantially" assist any violation of Plaintiff's rights under the NJLAD. *Tarr v. Ciasulli*, 181 N.J. 70, 83 (2004). Individual liability under the NJLAD requires "active and purposeful conduct rather than mere omissions or negligence." *Shawn*, 2012 WL 3116722, at *7 (citing *Tarr*). There is no record evidence that Mr. Scott's assessment of the Senior Product Manager position had anything to do with Plaintiff's age or that he acted in concert with the Company to terminate Plaintiff's employment on the basis of his age. (Def. 56.1) (noting lack of any reference to age or eligibility for retirement during Mr. Scott's conversations with Mr. Lemm and Mr. Donatiello during SGE reorganization). Moreover, Defendants produced hundreds of emails during the course of discovery relating to the SGE process, none of which referenced

Plaintiff's age or retirement eligibility.  For these reasons, summary judgment in favor of Mr.

Scott for individual liability under the NJLAD is proper.

### C.     Plaintiff's Retaliation Claims Fail As A Matter of Law.

Plaintiff cannot, as a matter of law, establish a *prima facie* case of retaliation pursuant to

the ADEA, NJLAD or NYSHRL.  To establish a *prima facie* case of retaliation, Plaintiff must

show that:  (1) he participated in a protected activity; (2) that Defendants knew of the protected

activity; (3) adverse employment action; and (4) a causal connection between the protected

activity and the adverse employment action.  *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691

F.3d 119, 129 (2d Cir. 2012).[4]

Plaintiff's retaliation claim is based entirely on his purported entitlement to two weeks of

pay following his last day of work on October 17, 2013.  In his Amended Complaint, Plaintiff

alleges that at the time he was notified about the elimination of his position, he was "told that he

would continue to receive his salary until the end of October, but after he expressed his

opposition to Defendants' unlawful and discriminatory actions, the Company immediately

ceased paying [his] salary after October 17, 2013."  Dkt. No. 17 at ¶ 31.  This is untrue, and

Plaintiff has not yet corrected his pleadings to conform to his deposition testimony.  At his

deposition, Plaintiff correctly stated that he was told that "if he would agree to take phone calls

from [Mr. Scott] during the next two week period" that his "salary would continue for the two

week period."  (Def. 56.1 ¶¶ 117-118).  Plaintiff conceded that he "absolutely" refused the

request to work an additional two weeks for which he would be paid.  (Def. 56.1 ¶ 117).  Simply

put, Plaintiff did not get paid for the final two weeks of October because he did not perform any

work during that time.  This is undisputed and as such, Plaintiff cannot satisfy the final two

---

[4]      *See also Seabrook v. NYC Health & Hospitals Corp.*, No. 13-4164, 2015 WL 273652, at *10
(S.D.N.Y. Jan. 20, 2015) (applying standard to NYSHRL); *Deville v. Givaudan Fragrances Corp.*, 419 F.
App'x 201, 205 (3d Cir. 2011) (applying standard to NJLAD).

elements necessary to sustain a *prima facie* case of retaliation, as there is absolutely no adverse

employment action upon which he can sustain his claim.

> ### D.   Plaintiff Was Properly Classified As An Exempt Employee.

Summary judgment in favor of Defendants is appropriate because there is no genuine

issue of material fact as to whether Plaintiff was properly classified as exempt under the FLSA,

NYLL and NJWHL.  Employees, like Plaintiff, who work in an administrative capacity, are

exempt from the overtime compensation requirements of the FLSA and state statutes.  29 U.S.C.

§ 213(a)(1); *see also Romero v. H.B. Auto. Group, Inc.*, No. 11-386, 2012 WL 1514810, at *7

(S.D.N.Y. May 1, 2012) ("The New York State Department of Labor takes the position that the

overtime provisions contained in [the NYLL] expressly incorporate the FLSA's exemptions").

To qualify for the administrative exemption, three conditions must be satisfied.  *Raffe v. Am.*

*Nat'l Red Cross*, No. 08-211, 2011 WL 6019436, at *9 (N.D.N.Y Nov. 30, 2011).  The first

condition is undisputedly satisfied, as Plaintiff earned more than $455 per week, and in his last

full year of work earned $1913.50 per week, the equivalent of $99,483.80 per year.  29 C.F.R. §

541.200(a)(1); Def. 56.1 ¶¶ 121-122.  Second, the employee's primary duty must be "the

performance of office or non-manual work directly related to the management or general

business operations of the employer or the employer's customers."  *Raffe*, 2011 WL 6019436, at

*9-11 (citing 29 C.F.R. §541.200(a)(2)).  Finally, the employee's "primary duty" must include

"the exercise of discretion and independent judgment with respect to matters of significance."

*Raffe*, 2011 WL 6019436, at *12 (citing 29 C.F.R. §541.200(a)(3)).  All of these conditions are

satisfied here.

Federal regulations define "primary duty" as "the principal, main, major or most

important duty that the employee performs."  29 C.F.R. § 541.700(a).  "To determine whether [a]

plaintiff['s] performance of these exempt activities constitutes [his] 'primary duty,' a court must

consider 'the character of an employee's job as a whole.'"  *Mullins v. City of New York*, 653 F.3d

104, 106 (2d Cir. 2011).  Factors to consider:

> "include, but are not limited to, the relative importance of the exempt duties as
> compared with other types of duties; the amount of time spent performing exempt
> work; the employee's relative freedom from direct supervision; and the
> relationship between the employee's salary and the wages paid to other employees
> for the kind of nonexempt work performed by the employee."

> 29 C.F.R. § 541.700(a).

To meet the "directly related to the management and general operations" requirement, the

plaintiff "must perform work directly related to assisting with the running or servicing of the

business, as distinguished, for example, from working on a manufacturing production line or

selling a product in a retail or service establishment."  29 C.F.R. § 541.201(a).  Such work:

> includes, but is not limited to, work in functional areas such as tax; finance;
> accounting; budgeting; auditing; insurance; quality control; ***purchasing***;
> ***procurement***; advertising; marketing; research; safety and health; personnel
> management; human resources; employee benefits; labor relations; public
> relations, government relations; computer network, internet and database
> administration; legal and regulatory compliance; and similar activities.

*Id*. § 541.201(b) (emphasis added).

The "line between 'production' and 'administrative' work is clear in the case of an

employee on an assembly line or sales personnel in a retail establishment."  *Graves v. Chubb &*

*Son, Inc.*, No. 12-568, 2014 WL 1289464, at *5 (D. Conn. Mar. 31, 2014).  The line is much less

clear in cases where what is produced "is an intangible service rather than a material good."  *Id.*

Here, however, the line is very clear.  U.S. Seal is a producer of tangible, material goods, which

is produced by employees who actually work on an assembly line.  (Def. 56.1 ¶ 2-3.)  It is

undisputed that Plaintiff did not work on the assembly line and was not directly involved in the

actual creation of the seals for which U.S. Seal is known.  (Def. 56.1¶¶ 10-29).  As such,

Plaintiff's responsibilities fell squarely within the administrative exemption.

19

Plaintiff's primary duties related to functional areas such as purchasing, procurement and inventory management, which was similar to an audit function.  29 C.F.R. § 541.201(b); *see generally*, *Cameron v. Abercrombie & Fitch Co.*, No. 10-631, 2012 WL 4057240, at *5 (S.D. Ohio Sept. 14, 2012) (holding that the plaintiff, who performed quality control for a clothing company, was not a production employee because, inter alia, "she was not involved in the manufacturing or selling of [the employer's] product in the manner contemplated by the regulations," and rejecting the plaintiff's argument that her "duties were directly related to the production of clothes"); *Caveness v. Vogely & Todd*, No. 10-0650, 2011 WL 3841649, at *2-5 (M.D. Tenn. Aug. 30, 2011) (holding that an employee of an automobile repair shop who made repair estimates, set repair schedules, and assigned repair work was not a production employee); *LaCourse v. GRS III*, No. 05-73613, 2006 WL 3694623, at *1-2, *19 (E.D. Mich. Dec. 13, 2006) (finding that a training consultant who "develop[ed] manufacturing and repair methods and systems on new products" for General Motors was not a production employee because he "was not engaged in producing motor vehicles; rather, he taught the production employees how to conduct certain repairs so the assembly line could proceed").

Plaintiff's primary responsibilities included:  (1) managing inventory; (2) issuing work orders; (3) expediting deliveries; (4) generating quotes for deliveries to the sales department and customers; (5) issuing purchase orders to outside vendors; and (6) expediting purchase orders to outside vendors when necessary.  (Def. 56.1 ¶ 10).  While managing inventory for U.S. Seal, Plaintiff set safety stock levels, which entailed monitoring the level of inventory on an item the site was authorized to carry.  (Def. 56.1 ¶ 16).  When issuing work orders, Plaintiff reviewed reports to "determine whether to go ahead and make [an] item, whether [U.S. Seal] could assemble the item completely [and] issue the work order."  (Def. 56.1 ¶ 18).  If the inventory

20

level went below a certain amount, Plaintiff evaluated a cross-section of data to determine if a new product needed to be made.  (Def. 56.1 ¶ 19).

Although Plaintiff did not have any direct reports, he advised both U.S. Seal employees and external customers when quoting deliveries.  (Def. 56.1 ¶ 26).  Plaintiff checked availability of missing components, estimated the length of time necessary to get various components so that he could advise the sales department or the external customer about expected delivery dates.  (Def. 56.1 ¶ 27).  He reviewed the "historical movements" of an item, determined how much of an item to order and then verified the current cost of the item.  (Def. 56.1 ¶ 28).  Because data on the U.S. Seal system was at times outdated, Plaintiff leveraged his relationships with vendors in order to get current cost data.  (Def. 56.1 ¶ 29).  As Mr. Stockslager observed repeatedly during his evaluation of Plaintiff's performance, he was an integral part of U.S. Seal's business.  (Def. 56.1 ¶¶ 13-15).  In sum, Plaintiff's work was ancillary to U.S. Seal's principal production activity and as such, subject to the administrative exemption.  *Lutz v. Huntington Bancshares Inc.,* No. 12-1091, 2014 U.S. Dist. LEXIS 86435 (S.D. Ohio June 25, 2014) ("If a court determines that the plaintiff is not a production employee, it must then move to the second step of the analysis and determine whether he or she performs administrative work. Work that is "ancillary to an employer's principal production activity" is administrative); *Estrada v. Maguire Ins. Agency, Inc.*, No. 12-604, 2014 WL 795996, at *4-5 (E.D. Pa. Feb. 28, 2014) (same).

The term "matters of significance" refers to the level of importance or consequence of the work performed.  29 C.F.R. § 541.202(a).  Additionally, the "phrase 'discretion and independent judgment' must be applied in the light of all the facts involved in the particular employment situation in which the question arises."  *Id*. § 541.202(b) (citations omitted).  Factors to consider in making this determination include, but are not limited to:

"[w]hether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long-or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances."

*Id.* Courts "generally find that employees who meet at least two or three of these factors are exercising discretion and independent judgment . . . ." *Raffe*, 2011 WL 6019436, at *9-13 (citing 69 Fed. Reg. 22122, 22143 (Apr. 23, 2004)).

The undisputed evidence clearly demonstrates that Plaintiff's primary duties included the exercise of discretion and independent judgment. His responsibilities were unquestionably related to the operation of U.S. Seal's business, as he helped determine how to best manage inventory of materials in order to balance the needs of U.S. Seal with those of its clients. (Def. 56.1 ¶¶ 18-25). Plaintiff had the authority to prioritize the manufacture of products based on his analysis of pending work orders and inventory needs. (Def. 56.1 ¶ 21, 25). Plaintiff's independence and discretion were also reflected in his ability to perform his job remotely for 13 years with minimal oversight from Mr. Stockslager or Mr. Scott. (Def. 56.1 ¶¶ 5-9). The reason the Company considered removing the remote work option was to help make communications more efficient across departments at U.S. Seal. (Def. 56.1 ¶ 99). It was completely unrelated to any concerns regarding oversight of the position. (Def. 56.1 ¶¶ 98-99).

As Plaintiff observed, Mr. Stockslager had confidence in his abilities and despite his remote working arrangement, Plaintiff was not required to report on his activities more than once a month at the most. (Def. 56.1 ¶¶ 5-9). The monthly reporting requirements remained the same

22

under Mr. Scott and lasted until the end of his employment.  (Def. 56.1 ¶¶ 5-9).  Mr. Stockslager observed that Plaintiff "demonstrat[ed] a high level of competency in the skills and knowledge required [to] perform his job" and observed that Plaintiff's "decisions [were] on target and reflec[ed] his reliable, sound judgment skills."  (Def. 56.1 ¶ 13).  He was acknowledged for his "clear understanding of the business implications of each decision he ma[d]e."  (Def. 56.1 ¶ 14).  Mr. Stockslager also recognized Plaintiff's ability to "confront[] difficult situations quickly [and] consistently appl[y] a win-win approach to negotiating outcomes."  (Def. 56.1 ¶ 15).  Plaintiff testified that he was given significant autonomy, and that he leveraged his experience to perform various tasks, such as managing inventory levels.  (Def. 56.1 ¶ 17).  Plaintiff testified that he leveraged his "historical intermixing with the inventory, feelings, knowledge of where components were used elsewhere" to ensure that he did not "commit all components [] to one particular work order" to prevent U.S. Seal from being out of stock of items and unable to make other "finished goods." (Def. 56.1 ¶¶ 22-23).  He was frequently involved in matters of significance, "interfac[ing] with various people in the organization."  (Def. 56.1 ¶ 24).

The undisputed, record evidence clearly demonstrates that Plaintiff's primary duties:  (1) were directly related to the management or general business operations at U.S. Seal and (2) required the exercise of discretion and independent judgment with respect to matters of significance.  No reasonable jury could find otherwise and as such, summary judgment is appropriate.

     **E.**    **Plaintiff's New Jersey State Law Claims Should Be Dismissed.**

Because his tenuous contact with the state falls short of establishing that Plaintiff actually worked in New Jersey, the claims at Counts II, IX and X of the Amended Complaint should be dismissed.  At his deposition, Plaintiff testified that he worked from his home in Woodmere, New York for at least the last 13 years of his employment.  (Def. 56.1 ¶¶ 5-8).  Although

Plaintiff once reported in person to U.S. Seal's site in Edison, New Jersey on a daily basis, (Def. 56.1 ¶¶ 5-8), that time clearly falls outside the applicable statutory periods for his New Jersey state claims.  The NJWHL does not apply to individuals working outside of the state, even if their employer is based in New Jersey.  *See e.g. Redick v. E. Mortg. Mgmt., LLC*, No. 11-1260, 2013 WL 1089710, at *12 (D. Del. Mar. 15, 2013) (ruling that the NJWHL is inapplicable to employee who worked in Delaware for a New Jersey company); *Goodman v. Port Auth. of N.Y. & N.J.*, 850 F. Supp. 2d 363, 383 (S.D.N.Y. 2012) (dismissing New Jersey wage claim, noting that to avail himself of New Jersey wage laws, plaintiff must have worked in New Jersey).  Indeed, Plaintiff came in occasionally at the request of his supervisor, but that rarely amounted to more than 15-20 times per year.  *Norenius v. Multaler, Inc.*, Dkt. L-449-06, 2009 WL 4162878, at *7 (N.J. App. Div. Sept. 11, 2008) ("[A]ny occasional contact with New Jersey as part of their employment was insufficient to turn those visits into plaintiffs being 'based' in New Jersey for employment purposes."); *see also* Def. 56.1 ¶ 9.

In *Overton v Sanofi-Aventis U.S., LLC*, No. 13-5535, 2014 WL 5410653, at *5-6 (D.N.J. Oct. 23, 2014 ), the court acknowledged that the issues of whether the NJWPL applies to employees who live and work outside of New Jersey, even if the employer is based in New Jersey, has seldom been addressed.  In *Overton*, the plaintiffs worked for a New Jersey-based employer and visited the employer's New Jersey office occasionally for training.  2014 WL 5410653, at *5-6.  The *Overton* plaintiffs argued that the statute applied because they were supervised from New Jersey, issued credentials as New Jersey employees and the address on their business cards was the address of the employer's Bridgewater, New Jersey location.  *Id.* The court surveyed previous opinions on the issue and found that those courts held that the NJWPL does not apply to employees based outside of New Jersey.  *Id.*  The court found the

24

reasoning in those cases persuasive because they were "in line with the governmental interest analysis governing New Jersey's choice of law determinations." *Id.* at *5-6 (citations omitted). The court further observed that "[t]he states where these plaintiffs lived and worked would have the greatest interest in their treatment as employees." *Id.* at *6 (citations omitted). For these same reasons, Plaintiff's New Jersey state law claims should be dismissed in their entirety. Plaintiff lived in New York and spent most of his time during the applicable statutory periods working there as well. Per the *Overton* ruling, Plaintiff's state law claims should be limited to the New York statutes identified in his Amended Complaint.[5]

## IV.   <u>CONCLUSION</u>

For all the reasons stated above, Defendants' Motion for Summary Judgment should be granted and Amended Plaintiff's Complaint should be dismissed in its entirety, with prejudice. Further, Defendants should be awarded its costs incurred in making this motion, together with such other relief as the Court deems just, proper and equitable.

Dated:  July 1, 2015                    Respectfully submitted,

                                        MORGAN, LEWIS & BOCKIUS LLP
                                        By:_____s/_ Jocelyn L. Womack_____
                                        Sarah E. Bouchard (admitted *pro hac vice*)
                                        Jocelyn L. Womack (admitted *pro hac vice*)
                                        1701 Market St.
                                        Philadelphia, Pennsylvania 19103
                                        (215) 963-5000/(215) 963-5001
                                        sbouchard@morganlewis.com
                                        jwomack@morganlewis.com

                                        Melissa D. Hill
                                        101 Park Ave.
                                        New York, New York 10178
                                        (212) 309-6000/(212) 309-6001 (fax)
                                        melissa.hill@morganlewis.com

---

[5]     Plaintiff's New York state claims should be dismissed for the reasons set forth in *supra* Sections III (B)-(D).

25